IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

HENRY D. LIU,                                      3:14-CV-00908-BR

        Plaintiff,                         OPINION AND ORDER

v.

PORTLAND STATE UNIVERSITY, et
al.,

        Defendants.


**MICAH D. FARGEY**
Fargey Law PC
5 Centerpointe Drive, 4th Floor
Lake Oswego, OR 97035
(503) 946-9426

        Attorneys for Plaintiff

**P.K. RUNKLES-PEARSON**
**SHARAE M. WHEELER**
Miller Nash LLP
111 S.W. Fifth Avenue
Suite 3400
Portland, OR 97204
(503) 205-2314

        Attorneys for Defendants Portland State University,
        Jacqueline Balzer, Domanic Thomas, and Joseph Schilling


1 - OPINION AND ORDER

**TRACY REEVE**
Portland City Attorney
**J. SCOTT MOEDE**
**WADE H. TUCKER**
Deputy City Attorneys
1221 S.W. Fourth Avenue, Suite 430
Portland, OR 97204
(503) 823-4047

>           Attorneys for Defendants City of Portland and James
>           Crooker

**KAREN O'KASEY**
**JASON R. POSS**
Hart Wagner LLP
1000 S.W. Broadway, Twentieth Floor
Portland, Oregon 97205
(503) 222-4499

>           Attorneys for Defendant Oregon Health & Sciences
>           University

**DUNCAN K. FOBES**
Patterson Buchanan Fobes & Leitch
2112 Third Avenue, Suite 500
Seattle, WA 98121
(206) 462-6700

>           Attorneys for Defendant Cascadia Behavioral Healthcare


**BROWN, Judge.**

This matter comes before the Court on the Renewed Motion

(#162) for Summary Judgment of Defendant Cascadia Behavioral

Healthcare, Inc.  For the reasons that follow, the Court **GRANTS**

Cascadia's Motion and **DISMISSES with prejudice** Plaintiff's claims

against Cascadia.


2 - OPINION AND ORDER

**BACKGROUND**

The following facts are taken from the Agreed Facts in the parties' Pretrial Order and the parties' materials related to Cascadia's Motion for Summary Judgment and are undisputed unless otherwise noted.

Plaintiff Henry D. Liu was enrolled as a graduate student in the Conflict Resolution Program at Portland State University (PSU) from the beginning of the fall term in 2011 through June 21, 2012.

On April 20, 2012, another graduate student in the Conflict Resolution Program told PSU Professor Rachel Cunliffe that Plaintiff had made statements about the faculty that the student found threatening. At some point the student also reported her conversation with Plaintiff to PSU Campus Public Safety (CPS) Officer Sergeant Joseph Schilling. The student specifically advised Sergeant Schilling that she was a classmate of Plaintiff and that Plaintiff told the student during a break from class on April 12, 2012, that (1) Plaintiff "had issues" with the Conflict Resolution Program and its Director, Professor Robert Gould, because of an unsatisfactory grade that he had received after he caused another student to cry in class; (2) he "had issues" because a fellow student had allegedly used the word "chink" while speaking with him; and (3) he made statements that made the student believe he was angry because he felt faculty members were

treating him differently due to his ethnicity.  The student also
advised Sergeant Schilling that Plaintiff told her after class on
April 12, 2012, that he had a back or spinal injury and was
taking a large amount of pain medication that often interfered
with his thinking and daily activity.  The student suggested
alternatives such as yoga and meditation to relieve stress, but
Plaintiff stated:  "[T]his situation is really pushing me over
the edge and we know what happens when students are pushed over
the edge."  The student emailed Plaintiff shortly after April 12,
2012, and Plaintiff responded he was very stressed, upset, and
unable to sleep and was "becoming aware of repressed emotions of
anger."  The student told Sergeant Schilling that the student
talked to Plaintiff after class on April 19, 2012, about
Professor Gould, and Plaintiff became agitated, raised his voice,
used profanity, and stated:  "I'm about ready to stick a .45 in
his ass."  Plaintiff then lowered his voice and apologized, but
he continued to express frustration and stated he was unable to
sleep.  He also repeated he was taking a lot of pain medication,
but it was not helping his pain level.  Plaintiff added:
"Professor Stan Sitnick giving him a [bad] grade did not help
. . ., 'he could get shot.'"  Plaintiff told the student that he
was noticing he had "a lot of hatred."  The student became
alarmed, changed the subject, and asked Plaintiff if he had
weekend plans.  Plaintiff responded he planned to go to "target

practice on Sunday."  Sergeant Schilling believed the student's
statements were credible and felt concerned.

Sergeant Schilling ascertained Plaintiff was living off of
the PSU campus.  Accordingly, Sergeant Schilling contacted the
Portland Police Bureau and shared with Portland Police Officer
James Crooker the student's statements about Plaintiff.

Officer Crooker contacted Cascadia's Project Respond Team
and asked them to assist in a visit to Plaintiff's residence for
a mental-health evaluation and possible Director's Hold pursuant
to former Oregon Revised Statute § 426.233.

On April 20, 2012, Officer Crooker, Portland Police Officer
Jason Walters, Sergeant Schilling, CPS Officer David Baker, and
Cascadia Project Respond personnel Rachel Phariss and Sarah
Schellhorn went to Plaintiff's residence to address what they
considered to be Plaintiff's possible threat to the community.
Phariss and Schellhorn waited around the corner from Plaintiff's
apartment while Officers knocked on Plaintiff's door.

Officer Crooker testifies in his Declaration that Plaintiff
"appeared dazed and confused and was unable to communicate
clearly" when he answered the door.  Decl. of James Crooker at
¶ 8.  Plaintiff permitted the officers to enter his apartment.
Officer Crooker asked Plaintiff if there were any firearms in his
apartment, and Plaintiff stated he did not have any firearms.
When the officers entered Plaintiff's apartment, however, they

5 - OPINION AND ORDER

observed pamphlets for firearms on a table as well as an empty

rifle box.  At that point Officer Crooker asked Plaintiff again

if there were any firearms in his apartment.  Officer Crooker

testifies in his Declaration that Plaintiff "began to back away

from [Officer Crooker] and the other officers.  In response

[Officer Crooker] took [Plaintiff's] wrist and handcuffed

Plaintiff 'for his own safety' and read Plaintiff his *Miranda*

rights.  After some discussion Plaintiff told the officers that

he had firearms and agreed to tell the officers where to find

them in his apartment.  Officers eventually found unloaded .22

and .45 caliber handguns, an unloaded M4 carbine assault rifle,

an unloaded 9mm handgun, and 'thousands of rounds of

ammunition.'"  Crooker Decl. at ¶ 10.  Officers also found

"various knifes, survival tools (including an axe), a canteen,

water bottles, dressings for wounds, rope, extra magazine clips,

and flashlights."  *Id.*  Officer Crooker testified in his

Declaration that in his experience "[t]he manner in which all

these items were laid out was consistent with that of a

moment's-notice preparedness for immediate accessibility to grab

pre-packed grab bags in the event that combat were to occur

suddenly."  *Id.*  The officers also found prescriptions for

Percocet and Tramadol in Plaintiff's name, two bottles of

Oxycodone prescribed to Plaintiff's father, and several empty

bottles of alcohol.  Officer Crooker spoke with Plaintiff, and,

6 - OPINION AND ORDER

"after a lengthy conversation," Plaintiff admitted he had made

"bone-headed" comments "including something about using a .45

caliber handgun to kill a professor." Crooker Decl. at ¶ 11.

Pharis and Schellhorn entered Plaintiff's apartment after

Officer Crooker handcuffed Plaintiff. Pharis and Schellhorn

interviewed Plaintiff for 30 or 40 minutes. Pharis testifies in

her Declaration that Plaintiff agreed the police could remove the

firearms from his apartment. Plaintiff, however, "appeared to be

confused and . . . kept sending the police to the wrong places to

locate the weapons he had throughout his apartment." Decl. of

Rachel Pharis at ¶ 6. Pharis states:

> [Plaintiff] said he could not remember making the
> threatening comments he made to [the student], but
> he admitted that he may have made such comments.
> [Plaintiff's] conversation was vague and he kept
> going off on tangents. His thought process was
> circular. He denied hearing voices or having
> hallucinations. I could not tell if he was
> disoriented, but he did appear to be confused. He
> denied any mental health history, and he denied
> having any intent to harm himself. He seemed to
> marginalize the allegation that he had made
> threats about shooting one of his professors. He
> also denied having any intention to shoot anyone
> at PSU.
>
> I observed the following things while I was in
> [Plaintiff's] apartment: (1) the receipt from his
> recently purchased AR 15 indicated that he had
> bought it after his problems with PSU began;
> (2) [Plaintiff] had ammunition and tactical gear,
> including duffle bags with dehydrated food,
> knives, and "quick stop", which will stop bleeding
> if a person is shot by a bullet; (3) there were
> empty beer, liquor, and wine bottles strewn about
> the apartment; and (4) there were Percocet and
> Tramadol pills on his coffee table as well as two

bottles of Oxycodone with [Plaintiff's] father's name on them.

Phariss Decl. at ¶¶ 7-8.  Phariss testifies "[d]iagnosing [Plaintiff] was difficult because it was unclear whether his behavior was due to alcohol, drugs, or mental illness."  Phariss Decl. at ¶ 9.  Phariss, therefore, deferred diagnosis, but she decided Plaintiff "would benefit from a full psychological evaluation."  Phariss and Schellhorn consulted with Meg Kaveny, Cascadia Project Respond Supervisor, and Kaveny consulted with Jay Auslander, Cascadia's Director of Emergency Services. Ultimately Phariss, Kaveny, and Auslander concluded a Director's Hold on Plaintiff was justified because there was probable cause to believe Plaintiff was

> dangerous to others and [in] need of immediate
> psychological evaluation based on
> (1) [Plaintiff's] speech latency, which did not
> appear to be a language issue; (2) [Plaintiff's]
> apparent confusion; (3) [Plaintiff's] vague
> explanations of his behavior; (4) [Plaintiff]
> minimizing the allegations against him and not
> appreciating the seriousness of making threats;
> (5) the information regarding his statements
> threatening to shoot one of his professors; and
> (6) the large amount of weapons, ammunition, and
> tactical gear found in his apartment.

Phariss Decl. at ¶ 9.  Phariss completed a Report of Peace Officer Custody of an Allegedly Mentally Ill Person as Directed by a Community Mental Health Director and issued a Director's Hold on Plaintiff for the following reasons:

8 - OPINION AND ORDER

> Concerns about targeted specific threats, large number
> of firearms, ammo & tactical gear, speech latencies,
> confusion & vague explanation of behavior & previous
> statements that minimize concerns.  Extreme risk of
> potential harm to others as evidenced by the above risk
> factors.

Phariss Decl., Ex. 1 at 1.  The Report directed Officer Crooker
to take Plaintiff into custody and to transport Plaintiff to
Oregon Health and Science University (OHSU) for evaluation.
Officer Crooker transported Plaintiff to OHSU in his patrol car.

Plaintiff remained at OHSU from April 20, 2012, through
April 25, 2012, during which time he was evaluated by numerous
medical professionals including Drs. Anne Gross, Bridgid Crowley,
Joshua Russell, and Robert Henrickson.

In June 2012 Plaintiff was expelled from PSU.

On May 2, 2014, Plaintiff filed *pro se* a first amended
complaint in Clatsop County Circuit Court against 40 Defendants
alleging seventeen claims for relief related to Plaintiff's
interactions with Portland police officers, the seizure of
Plaintiff's guns, Plaintiff's commitment to the OHSU psychiatric
ward, Plaintiff's expulsion from PSU, and articles about
Plaintiff's expulsion published by the PSU newspaper, *The
Vanguard*, all occurring between April 2012 and June 2012.

On June 5, 2014, Defendants removed the matter to this Court
on the basis of federal-question jurisdiction.

At some point before June 30, 2014, Plaintiff obtained
counsel.

On August 15, 2014, Plaintiff filed a Second Amended Complaint against 29 Defendants alleging nine claims for relief related to Plaintiff's interaction with various Portland police officers, the seizure of Plaintiff's guns, Plaintiff's commitment to the OHSU psychiatric ward, and Plaintiff's expulsion from PSU, all occurring between April 2012 and June 2012.

On August 28, 2015, PSU Defendants filed a Motion for Summary Judgment as to all of Plaintiff's claims against them.

On November 23, 2015, Plaintiff filed a Motion for Extension of Summary Judgment-Related Court-Imposed Deadlines, which PSU Defendants opposed.

On December 4, 2015, the Court held a status conference. Based on the parties' representations at that conference, the Court ordered the parties to meet in person and to confer regarding the dismissal of certain parties and claims from this proceeding.  The Court struck all pending Motions and directed the parties to file a preliminary Pretrial Order setting out the parties, claims, and defenses that remained in this matter after the parties' conferral.

On December 18, 2015, the parties filed a Joint Proposed Pretrial Order in which they dismissed numerous claims and parties and advised the Court that this matter would proceed only as to Plaintiff's claims (1) against the City of Portland and Officer Crooker pursuant to 42 U.S.C. § 1983 for unlawful seizure

10 - OPINION AND ORDER

in violation of Plaintiff's rights under the Fourth Amendment to
the United States Constitution; (2) against OHSU pursuant to 42
U.S.C. § 1983 for unlawful confinement in violation of the Fourth
Amendment to the United States Constitution; (3) against PSU,
Defendant Jacqueline Balzer, and Defendant Domanic Thomas
pursuant to 42 U.S.C. § 1983 for violation of Plaintiff's right
to due process under the Fourteenth Amendment to the United
States Constitution; (4) against the City of Portland and Officer
Crooker for false arrest and/or confinement in violation of state
law; (5) against Cascadia Behavioral Healthcare for unlawful
confinement in violation of state law; (6) against PSU,
Sergeant Schilling, and Cascadia for negligence "based on their
respective roles in the arrest of Plaintiff"; and (7) against
PSU, Balzer, and Thomas for negligence in "failing to exercise
due care in connection with the process and proceedings that led
to Plaintiff's expulsion from PSU."

On December 23, 2015, PSU Defendants filed a Renewed Motion
for Summary Judgment.

On January 15, 2016, Cascadia filed a Renewed Motion for
Summary Judgment.  The Court took Cascadia's Motion under
advisement on March 1, 2016.

On March 28, 2016, the Court issued an Opinion and Order in
which it granted PSU Defendants' Renewed Motion for Summary
Judgment and dismissed with prejudice Plaintiff's claims against

PSU Defendants.

## **STANDARDS**

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Washington Mut. Ins. v. United States*, 636 F.3d 1207, 1216 (9th Cir. 2011). *See also* Fed. R. Civ. P. 56(a). The moving party must show the absence of a dispute as to a material fact. *Rivera v. Philip Morris, Inc.*, 395 F.3d 1142, 1146 (9th Cir. 2005). In response to a properly supported motion for summary judgment, the nonmoving party must go beyond the pleadings and show there is a genuine dispute as to a material fact for trial. *Id.* "This burden is not a light one . . . . The non-moving party must do more than show there is some 'metaphysical doubt' as to the material facts at issue." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citation omitted).

A dispute as to a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002)(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The court must draw all reasonable inferences in favor of the nonmoving party. *Sluimer v. Verity, Inc.*, 606 F.3d 584, 587 (9th Cir. 2010). "Summary

12 - OPINION AND ORDER

judgment cannot be granted where contrary inferences may be drawn from the evidence as to material issues." *Easter v. Am. W. Fin.,* 381 F.3d 948, 957 (9th Cir. 2004)(citation omitted). A "mere disagreement or bald assertion" that a genuine dispute as to a material fact exists "will not preclude the grant of summary judgment." *Deering v. Lassen Cmty. Coll. Dist.,* No. 2:07-CV-1521-JAM-DAD, 2011 WL 202797, at *2 (E.D. Cal., Jan. 20, 2011) (citing *Harper v. Wallingford,* 877 F.2d 728, 731 (9th Cir. 1989)). When the nonmoving party's claims are factually implausible, that party must "come forward with more persuasive evidence than otherwise would be necessary." *LVRC Holdings LLC v. Brekka,* 581 F.3d 1127, 1137 (9th Cir. 2009)(citation omitted).

The substantive law governing a claim or a defense determines whether a fact is material. *Miller v. Glenn Miller Prod., Inc.,* 454 F.3d 975, 987 (9th Cir. 2006). If the resolution of a factual dispute would not affect the outcome of the claim, the court may grant summary judgment. *Id.*

## DISCUSSION

As noted, Plaintiff's remaining claims against Cascadia are for unlawful confinement in violation of state law and negligence "based on [its] role[] in the arrest of Plaintiff." Cascadia moves for summary judgment on both of Plaintiff's claims against it on the grounds that former Oregon Revised Statute § 426.355(6)

grants Cascadia complete immunity from liability or, in the

alternative, Plaintiff's claims against Cascadia are meritless.

Former Oregon Revised Statute § 426.233 authorized

Director's Holds at the time Phariss placed a Director's Hold on

Plaintiff.  Former § 426.233 provided in pertinent part:

> (1)(a) A community mental health program director
> . . . may take one of the actions listed in
> paragraph (b) of this subsection when the
> community mental health program director or
> designee has probable cause to believe a person:
>
> > (A) Is dangerous to self or to any other
> > person and is in need of immediate care,
> > custody or treatment for mental illness.
>
> > * * *
>
> (b) The community mental health program director
> or designee under the circumstances set out in
> paragraph (a) of this subsection may:
>
> > (A) Notify a peace officer to take the person
> > into custody and direct the officer to remove
> > the person to a hospital or nonhospital
> > facility approved by the Oregon Health
> > Authority.

The Director's Hold authorized under former § 426.233 permits

only transportation of the individual to a hospital or facility.

After the individual is transported, former Oregon Revised

Statute § 426.232 permitted physicians to issue independently a

two-physician hold that authorized a physician to cause an

individual to be admitted to or retained at a hospital only after

consulting with a second physician and after determining the

individual is dangerous to himself or to others and in need of

emergency care or treatment for mental illness.  As noted,
Cascadia only issued the Director's Hold authorized by former
§ 426.233 and did not have any involvement in deciding to admit
or to retain Plaintiff when he arrived at OHSU.

Former Oregon Revised Statute § 426.335(6) provided:

> No peace officer, person authorized under ORS
> 426.233, community mental health director or
> designee, hospital or other facility, physician or
> judge shall in any way be held criminally or
> civilly liable for actions pursuant to ORS 426.228
> to 426.235 if the individual or facility acts in
> good faith, on probable cause and without malice.

Cascadia asserts this provision provides Cascadia with immunity
as to Plaintiff's claims because Phariss acted in good faith,
without malice, and with probable cause when she placed a
Director's Hold on Plaintiff.

Plaintiff, however, asserts Phariss did not have probable
cause[1] to issue the Director's Hold because the threats that
Plaintiff made were "merely hyperbolic," he did not do anything
illegal, he lawfully owned the firearms found at his apartment,
he was legally prescribed the Percocet and Tramadol, his father
left the Oxycodone when he visited Plaintiff's apartment, and
Plaintiff stated during his conversation with Officer Crooker
that he did not intend to commit any act of violence.

Probable cause is not defined in Chapter 426.  Oregon

---

[1] Plaintiff appears to concede that Phariss acted in good
faith and without malice and does not present any evidence to the
contrary.

15 - OPINION AND ORDER

courts, however, have analogized probable cause in Chapter 426 to the definition set out in Oregon Revised Statute § 131.005[2] and have held it is defined as "a substantial objective basis for believing that more likely than not a person is mentally ill." *See Pyles v. Winters*, No. 1:12-cv-00346-CL, 2013 WL 3475331, at *4 (D. Or. July 9, 2013)(citing *State v. Smith*, 71 Or. App. 205, 211 (1984)). When "determining whether objective probable cause exists, [the court must] consider the totality of the circumstances presented to the officer and reasonable inferences that may be drawn from those circumstances; no single factor is dispositive." *State v. Kelly*, 274 Or. App. 363, 372 (2015)(quotation omitted).

"'The determination of probable cause is a legal, not a factual, conclusion. Probable cause does not require certainty.'" *Pyles*, 2013 WL 3475331, at *4 (quoting *State v. Herbert*, 302 Or. 237, 241 (1986)). "[I]f there is probable cause, it is irrelevant if the person turns out to be noncommittable." *Id.* (citing *Chathas v. Smith*, 884 F.2d 980, 987 (7th Cir. 1989)). The issue, therefore, is not whether Plaintiff is mentally ill, but whether under the totality of the circumstances Cascadia had information sufficient to form a

---

[2] Oregon Revised Statute § 131.005(11) defines probable cause as "a substantial objective basis for believing that more likely than not an offense has been committed and a person to be arrested has committed it."

substantial objective belief that it was more likely than not
that Plaintiff was a danger to himself or to others.

As noted, Phariss testifies in her Declaration that
Plaintiff admitted he made threatening comments about PSU
professors and staff to another student.  In addition, evidence
in Plaintiff's apartment indicated he purchased an assault rifle
after his disagreements with his professors.  Plaintiff's
"conversation was vague and he kept going off on tangents.  His
thought process was circular."  Phariss testified Plaintiff
denied hearing voices or having hallucinations, but he did appear
to be confused.  Phariss testified although Plaintiff denied any
intent to shoot anyone at PSU, Plaintiff "marginalized the
allegation that he had made threats about shooting one of his
professors."  In addition, Phariss observed Plaintiff had
numerous firearms in his apartment as well as ammunition; duffle
bags with dehydrated food; knives; "quick stop"; empty beer,
liquor, and wine bottles strewn about the apartment; and Percocet
and Tramadol as well as two bottles of Oxycodone with Plaintiff's
father's name on them.

Plaintiff testifies in his Declaration that he had "camping
equipment, like backpacks, food, water, a first-aid kit,
including QuikClot and emergency supplies, rope, and an ax" in
his apartment on April 20, 2012, because his "fiancée was [going
to] visit[] from Shanghai, and [he] planned to take her camping."

17 - OPINION AND ORDER

Decl. of Henry Liu at ¶ 15.  Plaintiff also testifies he
attempted to explain the presence of these items to officers, but
"no one seemed to care."  *Id.*  As Cascadia points out, however,
Phariss stated in her contemporaneous Report that Plaintiff
"never explained his large amount of ammo or tactical gear to
[her] or the police."  In addition, Plaintiff's initial
assessment notes from when he arrived at OHSU on April 20, 2012,
reflect Plaintiff's statement that he "lives alone [and] does not
have a girlfriend/ partner."  Decl. of Micah D. Fargey, Ex. 2
at 9.  Similarly, on April 21, 2012, during Plaintiff's initial
psychiatric evaluation by Paul Leung, M.D., Plaintiff noted his
current relationships were "family."  Fargey Decl., Ex. 3 at 3.
Plaintiff did not mention a girlfriend or partner.  In
Plaintiff's Discharge Summary completed by Bridgid Crowley, M.D.,
on April 25, 2012, however, Plaintiff reportedly stated the
"packs found in his apartment were to be used for camping and
spending time outdoors with his fiance."  Fargey Decl., Ex. 2 at
19.

Plaintiff also testifies in his Declaration that he was not
dazed or confused when officers arrived at his apartment, and he
was polite, kind, respectful, patient, honest, and transparent.
Liu Decl. at ¶ 12.  The Declarations of Officer Crooker and
Phariss, however, indicate Plaintiff was confused.  Similarly,
Phariss's contemporaneous Report indicated Plaintiff was confused

and disoriented.  In addition, the OHSU intake notes from
April 20, 2012, reflect Plaintiff's thought process was
"disorganized, pt had trouble remembering questions, answering
questions sequentially, etc."  Fargey Decl., Ex. 2 at 9.
Plaintiff's memory was described as "unreliable, pt was not
forthcoming with either officers of SW, reports gaps in his
memory."  Id.

On this record the Court concludes Plaintiff has not
established there is any genuine dispute of material fact as to
whether Cascadia had information sufficient to form a substantial
objective belief, based on the totality of the circumstances,
that it was more likely than not that Plaintiff was a danger to
himself or to others.  Nevertheless, even when the record is
viewed in the light most favorable to Plaintiff, the Court
concludes as a matter of law that Cascadia had probable cause to
issue a Director's Hold on Plaintiff pursuant to former §
426.233.  Cascadia, therefore, is immune from Plaintiff's
remaining claims against it pursuant to § 426.335(6).

Accordingly, the Court grants Cascadia's Motion for Summary
Judgment.

## CONCLUSION

For these reasons, the Court **GRANTS** Cascadia's Motion (#162)
for Summary Judgment and **DISMISSES with prejudice** Plaintiff's

19 - OPINION AND ORDER

claims against Cascadia.

IT IS SO ORDERED.

DATED this 12th day of May, 2016.

_____
ANNA J. BROWN
United States District Judge