IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

HENRY D. LIU,                              3:14-CV-00908-BR

        Plaintiff,                         OPINION AND ORDER

v.

PORTLAND STATE UNIVERSITY, et
al.,

        Defendants.


**MICAH D. FARGEY**
Fargey Law PC
5 Centerpointe Drive, 4th Floor
Lake Oswego, OR 97035
(503) 946-9426

        Attorneys for Plaintiff

**P.K. RUNKLES-PEARSON**
**SHARAE M. WHEELER**
Miller Nash LLP
111 S.W. Fifth Avenue
Suite 3400
Portland, OR 97204
(503) 205-2314

        Attorneys for Defendants Portland State University,
        Jacqueline Balzer, Domanic Thomas, and Joseph Schilling


1 - OPINION AND ORDER

**TRACY REEVE**
Portland City Attorney
**J. SCOTT MOEDE**
**WADE H. TUCKER**
Deputy City Attorneys
1221 S.W. Fourth Avenue, Suite 430
Portland, OR 97204
(503) 823-4047

        Attorneys for Defendants City of Portland and James
        Crooker

**KAREN O'KASEY**
**JASON R. POSS**
Hart Wagner LLP
1000 S.W. Broadway, Twentieth Floor
Portland, Oregon 97205
(503) 222-4499

        Attorneys for Defendant Oregon Health & Sciences
        University

**DUNCAN K. FOBES**
Patterson Buchanan Fobes & Leitch
2112 Third Avenue, Suite 500
Seattle, WA 98121
(206) 462-6700

        Attorneys for Defendant Cascadia Behavioral Healthcare

**BROWN, Judge.**

   This matter comes before the Court on the Motion (#169) for
Summary Judgment of Defendant Oregon Health and Sciences
University (OHSU).  For the reasons that follow, the Court **GRANTS**
OHSU's Motion and **DISMISSES with prejudice** Plaintiff's claims
against OHSU.

## BACKGROUND

The following facts are taken from the Agreed Facts in the parties' Pretrial Order and the parties' materials related to OHSU's Motion for Summary Judgment and are undisputed unless otherwise noted.

Plaintiff Henry D. Liu was enrolled as a graduate student in the Conflict Resolution Program at Portland State University (PSU) from the beginning of the fall term in 2011 through June 21, 2012.

On April 20, 2012, another graduate student in the Conflict Resolution Program told PSU Professor Rachel Cunliffe that Plaintiff had made statements about the faculty that the student found threatening. At some point the student also reported her conversation with Plaintiff to PSU Campus Public Safety (CPS) Officer Sergeant Joseph Schilling. The student specifically advised Sergeant Schilling that she was a classmate of Plaintiff and during a break from class on April 12, 2012, Plaintiff told the student that (1) Plaintiff "had issues" with the Conflict Resolution Program and its Director, Professor Robert Gould, because of an unsatisfactory grade that he had received after he caused another student to cry in class; (2) he "had issues" because a fellow student had allegedly used the word "chink" while speaking with him; and (3) he made statements that made the student believe he was angry because he felt faculty members were

treating him differently due to his ethnicity.  The student also advised Sergeant Schilling that Plaintiff told her after class on April 12, 2012, that he had a back or spinal injury and was taking a large amount of pain medication that often interfered with his thinking and daily activity.  The student suggested alternatives such as yoga and meditation to relieve stress, but Plaintiff stated:  "[T]his situation is really pushing me over the edge and we know what happens when students are pushed over the edge."  The student emailed Plaintiff shortly after April 12, 2012, and Plaintiff responded he was very stressed, upset, and unable to sleep and was "becoming aware of repressed emotions of anger."  The student told Sergeant Schilling that the student talked to Plaintiff after class on April 19, 2012, about Professor Gould, and Plaintiff became agitated, raised his voice, used profanity, and stated:  "I'm about ready to stick a .45 in his ass."  Plaintiff then lowered his voice and apologized, but he continued to express frustration and stated he was unable to sleep.  He also repeated he was taking a lot of pain medication, but it was not helping his pain level.  Plaintiff added:  "Professor Stan Sitnick giving him a [bad] grade did not help . . ., 'he could get shot.'"  Plaintiff told the student that he was noticing he had "a lot of hatred."  The student became alarmed, changed the subject, and asked Plaintiff if he had weekend plans.  Plaintiff responded he planned to go to "target

4 - OPINION AND ORDER

practice on Sunday." Sergeant Schilling believed the student's statements were credible and felt concerned.

Sergeant Schilling ascertained Plaintiff was living off of the PSU campus. Accordingly, Sergeant Schilling contacted the Portland Police Bureau and shared with Portland Police Officer James Crooker the student's statement about Plaintiff.

Officer Crooker contacted the Project Respond team from Defendant Cascadia Behavorial Health Care and asked them to assist in a visit to Plaintiff's residence for a mental-health evaluation and possible Director's Hold pursuant to former Oregon Revised Statute § 426.233.

On April 20, 2012, Officer Crooker, Portland Police Officer Jason Walters, Sergeant Schilling, CPS Officer David Baker, and Cascadia Project Respond personnel Rachel Phariss and Sarah Schellhorn went to Plaintiff's residence to address what they considered to be Plaintiff's possible threat to the community. Phariss and Schellhorn waited around the corner from Plaintiff's apartment while Officers knocked on Plaintiff's door.

Officer Crooker testifies in his Declaration that Plaintiff "appeared dazed and confused and was unable to communicate clearly" when he answered the door. Decl. of James Crooker at ¶ 8. Plaintiff permitted the officers to enter his apartment. Officer Crooker asked Plaintiff if there were any firearms in his apartment, and Plaintiff stated he did not have any firearms.

5 - OPINION AND ORDER

When the officers entered Plaintiff's apartment, however, they observed pamphlets for firearms on a table as well as an empty rifle box.  At that point Officer Crooker asked Plaintiff again if there were any firearms in his apartment.  Officer Crooker testifies in his Declaration that Plaintiff "began to back away from [Officer Crooker] and the other officers.  In response [Officer Crooker] took [Plaintiff's] wrist and handcuffed Plaintiff 'for his own safety' and read Plaintiff his *Miranda* rights.  After some discussion Plaintiff told the officers that he had firearms and agreed to tell them where they could be found in his apartment.  Officers eventually found unloaded .22 and .45 caliber handguns, an unloaded M4 carbine assault rifle, an unloaded 9mm handgun, and 'thousands of rounds of ammunition.'" Crooker Decl. at ¶ 10.  Officers also found "various knifes, survival tools (including an axe), a canteen, water bottles, dressings for wounds, rope, extra magazine clips, and flashlights." *Id*.  Officer Crooker testified in his Declaration that in his experience "[t]he manner in which all these items were laid out was consistent with that of a moment's-notice preparedness for immediate accessibility to grab pre-packed grab bags in the event that combat were to occur suddenly." *Id*. Officers also found prescriptions for Percocet and Tramadol in Plaintiff's name, two bottles of Oxycodone prescribed to Plaintiff's father, and several empty bottles of alcohol.

Officer Crooker spoke with Plaintiff, and, "after a lengthy conversation," Plaintiff admitted he had made "bone-headed" comments "including something about using a .45 caliber handgun to kill a professor." Crooker Decl. at ¶ 11.

Phariss and Schellhorn entered Plaintiff's apartment after Officer Crooker handcuffed Plaintiff. Phariss and Schellhorn interviewed Plaintiff for 30 or 40 minutes. Phariss testifies in her Declaration that Plaintiff agreed the police could remove the firearms from his apartment. Plaintiff, however, "appeared to be confused and . . . kept sending the police to the wrong places to locate the weapons he had throughout his apartment." Decl. of Rachel Phariss at ¶ 6. Phariss states

> [Plaintiff] said he could not remember making the threatening comments he made to [the student], but he admitted that he may have made such comments. [Plaintiff's] conversation was vague and he kept going off on tangents. His thought process was circular. He denied hearing voices or having hallucinations. I could not tell if he was disoriented, but he did appear to be confused. He denied any mental health history, and he denied having any intent to harm himself. He seemed to marginalize the allegation that he had made threats about shooting one of his professors. He also denied having any intention to shoot anyone at PSU.
>
> I observed the following things while I was in [Plaintiff's] apartment: (1) the receipt from his recently purchased AR 15 indicated that he had bought it after his problems with PSU began; (2) [Plaintiff] had ammunition and tactical gear, including duffle bags with dehydrated food, knives, and "quick stop", which will stop bleeding if a person is shot by a bullet; (3) there were empty beer, liquor, and wine bottles strewn about

> the apartment; and (4) there were Percocet and
> Tramadol pills on his coffee table as well as two
> bottles of Oxycodone with [Plaintiff's] father's
> name on them.

Phariss Decl. at ¶¶ 7-8.  Phariss testifies "[d]iagnosing

[Plaintiff] was difficult because it was unclear whether his

behavior was due to alcohol, drugs, or mental illness."  Phariss

Decl. at ¶ 9.  Phariss, therefore, deferred diagnosis, but she

decided Plaintiff "would benefit from a full psychological

evaluation."  Phariss and Schellforn consulted with Meg Kaveny,

Cascadia Project Respond Supervisor, and Kaveny consulted with

Jay Auslander, Cascadia's Director of Emergency Services.

Ultimately Phariss, Kaveny, and Auslander concluded a Director's

Hold on Plaintiff was justified because there was probable cause

to believe Plaintiff was

> dangerous to others and need of immediate
> psychological evaluation based on
> (1) [Plaintiff's] speech latency, which did not
> appear to be a language issue; (2) [Plaintiff's]
> apparent confusion; (3) [Plaintiff's] vague
> explanations of his behavior; (4) [Plaintiff]
> minimizing the allegations against him and not
> appreciating the seriousness of making threats;
> (5) the information regarding his statements
> threatening to shoot one of his professors; and
> (6) the large amount of weapons, ammunition, and
> tactical gear found in his apartment.

Phariss Decl. at ¶ 9.  Phariss completed a Report of Peace

Officer Custody of an Allegedly Mentally Ill Person as Directed

by a Community Mental Health Director and issued a Director's

Hold on Plaintiff for the following reasons:

8 - OPINION AND ORDER

> Concerns about targeted specific threats, large
> number of firearms, ammo & tactical gear, speech
> latencies, confusion & vague explanation of
> behavior & previous statements that minimize
> concerns.  Extreme risk of potential harm to
> others as evidenced by the above risk factors.

Phariss Decl., Ex. 1 at 1.  The Report directed Officer Crooker

to take Plaintiff into custody and to transport Plaintiff to OHSU

for evaluation.  Officer Crooker transported Plaintiff to OHSU in

his patrol car.

At OHSU the in-patient nurse Cassondra Richard noted OHSU's

understanding that Plaintiff had been brought there pursuant to a

Director's Hold because, according to a fellow student, Plaintiff

had threatened professors and the Dean of PSU with "homicidal

violence," and police officers had found multiple firearms,

knives, tactical equipment, quikclot dressings, "thousands of

rounds of ammunition," multiple empty alcohol bottles, and

various prescription drugs in Plaintiff's apartment.  Decl. of

Micha Fargey, Ex. 2 at 8.  Nurse Richard also noted Plaintiff

"reportedly purchased [an] assault rifle in February after

threatening a professor for awarding [Plaintiff] with an

unsatisfactory grade."  *Id*.  On April 20, 2012, Plaintiff

underwent a number of intake evaluations including a Social Work

Mental Health Assessment conducted by social worker Erin Copley.

Copley noted Plaintiff denied homicidal feelings, reported

feeling remorseful for making the statements, and described his

statements as "offhand comment[s]."  *Id*.  Copley, however, noted

9 - OPINION AND ORDER

Plaintiff's thought processes were "[d]isorganized, pt had trouble remembering questions, answering questions sequentially, etc." Fargey Decl., Ex. 2 at 9. Copley described Plaintiff's memory as "[u]nreliable, pt was not forthcoming with either officers or SW, reports gaps in his memory." *Id.* Copley noted Plaintiff "presents as very intelligent and manipulative. He denied having any intent to harm anyone, but PPD report that they were concerned about the pt's lack of honesty in disclosing locations of guns, etc." Fargey Decl., Ex. 2 at 10.

On April 20, 2012, Plaintiff was evaluated by Drs. Robert Henrickson, M.D., and Joshua Russell, M.D., who noted Plaintiff had homicidal ideation and "means to accomplish plan." Fargey Decl., Ex. 2 at 2. Drs. Henrickson and Russell relied on Copley's "excellent note" regarding Plaintiff's "presentation" on arrival at OHSU. Drs. Henrickson and Russell noted Plaintiff denied his threats were "sincere," however, they "seem to have been able to be substantiated and [Plaintiff] would have clear reason to be less than forthright when faced with being placed on a psychiatric hold." *Id.* at 6.

Plaintiff was also seen by Andrea Moore, M.D., on April 20, 2012. Dr. Moore reported Plaintiff reported "the whole situation is a misunderstanding." Fargey Decl., Ex. 2 at 20. Dr. Moore reported Plaintiff's thought processes were "somewhat slow," and his "associations [were] logical/goal directed, at times

10 - OPINION AND ORDER

evasive." *Id*. at 23.  Dr. Moore noted Plaintiff's insight was limited and his judgment was poor.  *Id*.  Dr. Moore noted Plaintiff presented "differently in the ED where he was described as disorganized, pressured and psychotic, while on the unit here he has been calm and linear." *Id*. at 25.  Dr. Moore noted Plaintiff is "clearly very intelligent and it appears he may have been purposefully avoiding topics or manipulating our interview at times." *Id*.

On April 20, 2012, Nurse Miel Nelson noted Plaintiff was "calm and cooperative" and denied homicidal ideation.  Miel noted, however, that Plaintiff "endorse[d] having feelings of extreme anger towards his professor for what he says is an unjust grade he received." *Id*. at 14.  Miel noted Plaintiff had a "flat affect and intermittent eye contact" when discussing his threats and anger.  *Id*.

Plaintiff remained at OHSU from April 20, 2012, through April 25, 2012, during which time he was evaluated by numerous medical professionals including Drs. Anne Gross, Bridgid Crowley, Joshua Russell, and Robert Henrickson.

On April 25, 2012, Plaintiff was discharged from OHSU. Dr. Crowley noted in Plaintiff's discharge summary that Plaintiff did not display symptoms of psychosis or depression, and he "did not endorse" an intent to hurt himself or others.  Dr. Crowley noted Plaintiff had reported throughout his hospitalization that

11 - OPINION AND ORDER

he felt "misunderstood regarding statements he had made," and
felt anxious and did not sleep well during his stay.  Fargey
Decl., Ex. 2 at 17.  Dr. Crowley noted Plaintiff would not have
any access to weapons after he was discharged because his
firearms had been removed from his apartment.  Dr. Crowley
described Plaintiff's judgment and insight as "improving . . .;
at time of discharge he reported feeling 'regretful' about the
situation although he maintains that his statements were
misunderstood."  *Id*. at 18.  Plaintiff was discharged with a
prescription for Tramadol "to alleviate his chronic pain [and] to
decrease pain as a possible contribution to his ongoing stress
and to decrease risk of agitation."  *Id*. at 18.

In June 2012 Plaintiff was expelled from PSU.

On May 2, 2014, Plaintiff filed *pro se* a first amended
complaint in Clatsop County Circuit Court against 40 Defendants
alleging seventeen claims for relief related to Plaintiff's
interactions with Portland police officers, the seizure of
Plaintiff's guns, Plaintiff's commitment to the OHSU psychiatric
ward, Plaintiff's expulsion from PSU, and articles about
Plaintiff's expulsion published by *The Vanguard*, the PSU
newspaper, all occurring between April 2012 and June 2012.

On June 5, 2014, Defendants removed the matter to this Court
on the basis of federal-question jurisdiction.

At some point before June 30, 2014, Plaintiff obtained

12 - OPINION AND ORDER

counsel.

On August 15, 2014, Plaintiff filed a Second Amended
Complaint against 29 Defendants alleging nine claims for relief
related to Plaintiff's interaction with various Portland police
officers, the seizure of Plaintiff's guns, Plaintiff's commitment
to the OHSU psychiatric ward, and Plaintiff's expulsion from PSU,
all occurring between April 2012 and June 2012.

On August 28, 2015, PSU Defendants filed a Motion for
Summary Judgment as to all of Plaintiff's claims against them.

On November 23, 2015, Plaintiff filed a Motion for Extension
of Summary Judgment-Related Court-Imposed Deadlines, which PSU
Defendants opposed.

On December 4, 2015, the Court held a status conference.
Based on the parties' representations at that conference, the
Court ordered the parties to meet in person and to confer
regarding the dismissal of certain parties and claims from this
proceeding.  The Court struck all pending Motions and directed
the parties to file a preliminary Pretrial Order setting out the
parties, claims, and defenses that remained in this matter after
the parties' conferral.

On December 18, 2015, the parties filed a Joint Proposed
Pretrial Order in which they dismissed numerous claims and
parties and advised the Court that this matter would proceed only
as to Plaintiff's claims (1) against the City of Portland and

13 - OPINION AND ORDER

Officer Crooker pursuant to 42 U.S.C. § 1983 for unlawful seizure in violation of Plaintiff's rights under the Fourth Amendment to the United States Constitution; (2) against OHSU pursuant to 42 U.S.C. § 1983 for unlawful confinement in violation of the Fourth Amendment to the United States Constitution; (3) against PSU, Defendant Jacqueline Balzer, and Defendant Domanic Thomas pursuant to 42 U.S.C. § 1983 for violation of Plaintiff's right to due process under the Fourteenth Amendment to the United States Constitution; (4) against the City of Portland and Officer Crooker for false arrest and/or confinement in violation of state law; (5) against Cascadia Behavioral Healthcare for unlawful confinement in violation of state law; (6) against PSU, Schilling, and Cascadia for negligence "based on their respective roles in the arrest of Plaintiff"; and (7) against PSU, Balzer, and Thomas for negligence in "failing to exercise due care in connection with the process and proceedings that led to Plaintiff's expulsion from PSU."

On December 23, 2015, PSU Defendants filed a Renewed Motion for Summary Judgment.

On January 15, 2016, Cascadia filed a Renewed Motion for Summary Judgment.

On January 15, 2016, OHSU filed a Motion for Summary Judgment.  The Court took OHSU's Motion under advisement on March 1, 2016.

14 - OPINION AND ORDER

On March 28, 2016, the Court issued an Opinion and Order in which it granted PSU Defendants' Renewed Motion for Summary Judgment and dismissed with prejudice Plaintiff's claims against PSU Defendants.

On May 12, 2016, the Court granted Cascadia's Renewed Motion for Summary Judgment and dismissed with prejudice Plaintiff's claims against Cascadia.

## STANDARDS

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Washington Mut. Ins. v. United States*, 636 F.3d 1207, 1216 (9th Cir. 2011). *See also* Fed. R. Civ. P. 56(a). The moving party must show the absence of a dispute as to a material fact. *Rivera v. Philip Morris, Inc.*, 395 F.3d 1142, 1146 (9th Cir. 2005). In response to a properly supported motion for summary judgment, the nonmoving party must go beyond the pleadings and show there is a genuine dispute as to a material fact for trial. *Id*. "This burden is not a light one . . . . The non-moving party must do more than show there is some 'metaphysical doubt' as to the material facts at issue." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citation omitted).

A dispute as to a material fact is genuine "if the evidence

is such that a reasonable jury could return a verdict for the nonmoving party." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002)(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  The court must draw all reasonable inferences in favor of the nonmoving party.  *Sluimer v. Verity, Inc.*, 606 F.3d 584, 587 (9th Cir. 2010).  "Summary judgment cannot be granted where contrary inferences may be drawn from the evidence as to material issues."  *Easter v. Am. W. Fin.*, 381 F.3d 948, 957 (9th Cir. 2004)(citation omitted).  A "mere disagreement or bald assertion" that a genuine dispute as to a material fact exists "will not preclude the grant of summary judgment."  *Deering v. Lassen Cmty. Coll. Dist.,* No. 2:07-CV-1521-JAM-DAD, 2011 WL 202797, at *2 (E.D. Cal., Jan. 20, 2011) (citing *Harper v. Wallingford*, 877 F.2d 728, 731 (9th Cir. 1989)).  When the nonmoving party's claims are factually implausible, that party must "come forward with more persuasive evidence than otherwise would be necessary."  *LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1137 (9th Cir. 2009)(citation omitted).

The substantive law governing a claim or a defense determines whether a fact is material.  *Miller v. Glenn Miller Prod., Inc.*, 454 F.3d 975, 987 (9th Cir. 2006).  If the resolution of a factual dispute would not affect the outcome of the claim, the court may grant summary judgment.  *Id*.

## DISCUSSION

As noted, Plaintiff's remaining claim against OHSU is for unlawful confinement in violation of the Fourth Amendment to the United States Constitution brought pursuant to 42 U.S.C. § 1983. OHSU moves to dismiss Plaintiff's remaining claim against it on the grounds that Plaintiff's claim is untimely or, in the alternative, Plaintiff's claim against OHSU is without merit.

## I.   Plaintiff's claim is timely

As noted, Plaintiff was discharged from OHSU on April 25, 2012. Plaintiff's claim against OHSU relates solely to his time at OHSU. Accordingly, Plaintiff's claim against OHSU accrued no later than April 25, 2012.

Plaintiff filed his initial *pro se* complaint in Clatsop County on April 18, 2014. In his initial complaint Plaintiff alleged claims against OHSU for intentional infliction of emotional distress (IIED), negligence, negligence *per se*, unlawful imprisonment under state law, and violation of Oregon Revised Statute § 426. On May 2, 2014, Plaintiff filed *pro se* an amended complaint in Clatsop County in which he asserted claims against OHSU for IIED, negligence, negligence *per se*, and unlawful imprisonment under state law. On December 15, 2014, Plaintiff filed a Second Amended Complaint in this Court while represented by counsel in which he asserted for the first time a § 1983 claim against OHSU for unlawful arrest in violation of the

17 – OPINION AND ORDER

Fourth Amendment.  Finally, on December 18, 2015, Plaintiff
asserted for the first time in the Pretrial Order his current
§ 1983 claim against OHSU for unlawful confinement in violation
of the Fourth Amendment.

OHSU alleges Plaintiff's § 1983 claim for unlawful
confinement is untimely because it was not filed within two years
of the date of Plaintiff's release from OHSU and Plaintiff's
§ 1983 claim does not relate back to his claim against OHSU for
unlawful imprisonment, which was set out in his initial state-
court complaint.

**A.   § 1983 Statute of Limitations**

The Ninth Circuit has held courts must apply the forum
state's statute of limitations for personal-injury claims to any
claims brought under § 1983.  *See, e.g., Butler v. Nat'l Comm.
Renaissance of Ca*., 766 F.3d 1191, 1198 (9th Cir. 2014)("Section
1983 does not contain its own statute of limitations.  Without a
federal limitations period, the federal courts apply the forum
state's statute of limitations for personal injury actions.").
Under Oregon law personal-injury claims must be commenced within
two years of the injury.  *See* Or. Rev. Stat. § 12.110(1).

Plaintiff concedes he did not file his § 1983 for
unlawful confinement in violation of the Fourth Amendment against
OHSU within two years from the date his confinement at OHSU
ended, and, therefore, Plaintiff did not bring his claim within

18 - OPINION AND ORDER

two years of his injury.  Plaintiff, however, asserts his § 1983
claim relates back to his state-law unlawful imprisonment claim
asserted in his initial complaint, which was filed within the
applicable limitations period.

**B.    Relation Back to Plaintiff's Original Complaint**

The Ninth Circuit has held "[s]tate law, rather than
federal law, governs whether amendments relate back to the
original complaint in civil rights actions pursuant to 42 U.S.C.
§ 1983." *M.G. ex rel. Goodwin v. Cnty. of Contra Costa*, No.
11-4853, 2013 WL 706801, at *3 (N.D. Cal. Feb. 26, 2013)(quoting
*Merritt v. Cnty. of Los Angeles*, 875 F.2d 765, 768 (9th Cir.
1989)).  Oregon Rule of Civil Procedure 23(c) provides in
pertinent part:

> Whenever the claim . . . asserted in the amended
> pleading arose out of the conduct, transaction, or
> occurrence set forth or attempted to be set forth
> in the original pleading, the amendment relates
> back to the date of the original pleading.

As noted, Plaintiff asserts his § 1983 claim relates
back to his state-law unlawful imprisonment claim asserted in his
initial complaint, and, therefore, his § 1983 claim is timely.
Specifically, Plaintiff asserts his § 1983 claim for unlawful
confinement arises out of the same conduct or occurrence as that
set out in his initial state-law claim.

OHSU, in turn, asserts Plaintiff's § 1983 claim for
unlawful confinement does not relate back to his state-law

19 - OPINION AND ORDER

unlawful imprisonment claim because Plaintiff's § 1983 claim cannot be proven by the same kind of evidence as his original claim. Specifically, OHSU notes government bodies such as OHSU are not vicariously liable for acts of their employees. *See Monell v. Dep't of So. Svcs. of City of New York*, 436 U.S. 658, 691 (1978). Pursuant to *Monell*, OHSU can only be held liable under § 1983 if Plaintiff can establish a policy, custom, or practice of OHSU deprived Plaintiff of his constitutional rights. Plaintiff's initial and amended complaints in state court did not allege any policy, custom, or practice that OHSU violated nor is there any indication in those complaints that Plaintiff intended to assert his unlawful imprisonment claim arose out of a policy, practice, or custom of OHSU. In addition, because Plaintiff did not allege a § 1983 claim in his initial complaint against OHSU, OHSU did not have any reason to believe that Plaintiff intended to challenge its policies, practices, or customs rather than the actions of individual doctors. According to OHSU, therefore, Plaintiff's initial complaint failed to notify OHSU that its policies, customs, or practices resulted in tortious conduct, and, therefore, Plaintiff's current § 1983 claim against OHSU does not relate back to Plaintiff's initial complaint.

Plaintiff's state-law unlawful imprisonment claim asserted against OHSU in his initial complaint arose out of Plaintiff's hospitalization at OHSU. Plaintiff's § 1983 claim

20 - OPINION AND ORDER

against OHSU for unlawful confinement arises out of the same
hospitalization.   Nevertheless, those two claims do not arise out
of the same conduct or occurrence because in his initial
complaint Plaintiff complained about the actions of the
individual OHSU doctors who involuntarily committed Plaintiff.
In his § 1983 unlawful confinement claim Plaintiff complains
about a policy or custom of OHSU that resulted in his
confinement.   The Court notes, however, Plaintiff does not
identify with any degree of specificity what alleged policy or
custom of OHSU is at issue in his Second Amended Complaint, in
the Pretrial Order, or in his Response to OHSU's Motion for
Summary Judgment.   Thus, OHSU was not on notice that Plaintiff
was asserting an unidentified policy, custom, or practice of OHSU
was at issue in his unlawful confinement claim until Plaintiff
filed his Second Amended Complaint in December 2014, which was
more than two years after his confinement ended.

        The Court concludes on this record that Plaintiff's
§ 1983 claim against OHSU does not relate back to his unlawful
imprisonment claim, and, therefore, Plaintiff's claim against
OHSU is untimely.

## II.  Plaintiff has not established a § 1983 claim for unlawful confinement.

        Even if Plaintiff's § 1983 unlawful confinement claim
relates back to his initial complaint and is, therefore, timely,
the Court concludes Plaintiff has not established a genuine

21 - OPINION AND ORDER

dispute of material fact exists as to the lawfulness of
Plaintiff's confinement at OHSU.

As noted, liability of a government body will lie only when
"action pursuant to official municipal policy of some nature
caused a constitutional" violation and not on the basis of
*respondeat superior*. *Monell*, 436 U.S. at 691. Such liability
may attach only when an employee acted pursuant to an expressly-
adopted official policy or pursuant to a longstanding practice or
custom. *See, e.g., Lytle v. Carl*, 382 F.3d 978, 981 (9th Cir.
2004); *Webb v. Sloan*, 330 F.3d 1158, 1164 (9th Cir. 2003). "The
'official policy' requirement was intended to distinguish acts of
the *municipality* from acts of *employees* of the municipality, and
thereby make clear that municipal liability is limited to action
for which the municipality is actually responsible." *Pembaur v.
City of Cincinnati*, 475 U.S. 469, 479 (1986)(emphasis in
original). Municipal "[l]iability may attach . . . only where
the municipality itself causes the constitutional violation
through 'execution of a government's policy or custom, whether
made by its lawmakers or by those whose edicts or acts may fairly
be said to represent official policy.'" *Ulrich v. City and Cnty.
of San Francisco*, 308 F.3d 968, 984 (9th Cir. 2002)(quoting
*Monell*, 436 U.S. at 694).

The circumstances in which *Monell* liability may be found
under § 1983 are "carefully circumscribed." *Fuller v. City of*

*Oakland,* 47 F.3d 1522, 1534 (9th Cir. 1995).  *See also Westwood*

*v. City of Hermiston*, 787 F. Supp. 2d 1174, 1207 (D. Or. 2011)

(same).  The Ninth Circuit has noted:

> Showing a "longstanding practice or custom which
> constitutes the 'standard operating procedure' of
> the local government entity" is one way to
> establish municipal liability.  *Jett v. Dallas
> Indep. Sch. Dist.*, 491 U.S. 701, 737, 109 S. Ct.
> 2702, 105 L. Ed.2d 598 (1989); *Hopper v. City of
> Pasco*, 241 F.3d 1067, 1083 (9th Cir. 2001). . . .
> There are, however, two other routes available for
> a plaintiff to establish the liability of
> municipal defendants:  (1) by showing that the
> decision-making official was, as a matter of state
> law, a final policymaking authority "whose edicts
> or acts may fairly be said to represent official
> policy" in the area of decision, *Monell*, 436 U.S.
> at 694, 98 S. Ct. 2018; *City of St. Louis v.
> Praprotnik*, 485 U.S. 112, 124, 108 S. Ct. 915, 99
> L.Ed.2d 107 (1988)(plurality); *Pembaur*, 475 U.S.
> at 480-81, 106 S. Ct. 1292; or (2) by showing that
> an official with final policymaking authority
> either delegated that authority to, or ratified
> the decision of, a subordinate.

*Ulrich*, 308 F.3d at 984-85.  *See also Booke v. County of Fresno*,

98 F. Supp. 3d 1103, 1123 (E.D. Cal. 2015)("A municipality,

however, cannot be held liable solely because it employs a

tortfeasor — or, in other words, a municipality cannot be held

liable under [42 U.S.C. § 1983] under a *respondeat superior*

theory.  Liability only attaches where the municipality itself

causes the constitutional violation through execution of a

government's policy or custom, whether made by its lawmakers or

by those whose edicts or acts may fairly be said to represent

official policy.")(quotations omitted).

As noted, Plaintiff fails to identify in his Second Amended Complaint a policy, custom, or practice of OHSU that allegedly caused him to be unlawfully confined by OHSU.  The only allegation Plaintiff makes in his Second Amended Complaint related to any policy is contained in the section titled "Damages":

> The official policies, customs, and practices of the City, PSU, and OHSU caused the deprivation of Plaintiff's rights as alleged in this complaint. The policies, customs, and practices of these entities to inadequately train its employees, including the individual defendants, caused the violation of Plaintiff's rights.

Second Am. Compl. at ¶ 86.  Similarly, the Pretrial Order does not contain any allegation or facts by Plaintiff related to any policy, practice, or custom of OHSU that allegedly caused his constitutional violation.  In his Response to OHSU's Motion for Summary Judgment Plaintiff asserts OHSU did not have probable cause to detain Plaintiff and "Plaintiff's . . . confinement w[as] caused by an OHSU policy," but Plaintiff does not identify any policy at issue and instead points to a statement made by Dr. Gross at deposition that she

> in general [does] not drop notices of mental illness.  There is a protocol that we follow which includes close collaboration with the county that the patients will displace.  I have dropped holds, but it is not something that I standardly do.

Fargey Decl., Ex. 6 at 10.  Plaintiff appears to suggest there is a policy or practice at OHSU to "rubber-stamp" the admission of

24 - OPINION AND ORDER

patients who come into OHSU on Director's Holds without
conducting an independent evaluation, but Plaintiff does not
provide any authority for his assertion that a statement by an
individual doctor as to that doctor's general practice is
sufficient to establish that a broader policy, practice, or
procedure exists at OHSU.  At best, a statement by an individual
doctor is likely to establish only culpable conduct by the
individual doctor.

        In any event, even if a single statement by a single doctor
as to her routine procedure was sufficient to establish that
procedure was actually a policy, practice, or procedure of the
governmental body, Dr. Gross's statement does not do so.
Dr. Gross went on to state in her next sentence:  "In addition, I
think that [Plaintiff] deserved and warranted very thorough
evaluation for diagnostic purposes and to evaluate his safety."
Fargey Decl., Ex. 6 at 10.  Dr. Gross also testified she has
"dropped a notice of mental illness" in the past; specifically,
she has not admitted to OHSU a patient who came in on a
Director's Hold five to ten times while working at OHSU.
Finally, the record reflects Drs. Gross, Crowley, Russell, and
Henrickson as well as social workers and other mental-health
workers independently evaluated Plaintiff when he arrived at OHSU
and throughout his confinement.  Plaintiff does not point to any
expert evidence in the record that indicates the evaluations of

25 - OPINION AND ORDER

the various mental-health providers were medically incorrect, incomplete, or inaccurate or that his hold did not have a medically reasonable basis.

On this record the Court concludes Plaintiff has not established OHSU has a "policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy" that caused any constitutional violation of Plaintiff's rights. Accordingly, the Court grants OHSU's Motion for Summary Judgment.


<u>**CONCLUSION**</u>

For these reasons, the Court **GRANTS** OHSU's Motion (#169) for Summary Judgment and **DISMISSES with prejudice** Plaintiff's claim against OHSU.

IT IS SO ORDERED.

DATED this 16th day of May, 2016.


/s/ Anna J. Brown

_____
ANNA J. BROWN
United States District Judge


26 - OPINION AND ORDER