IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

HENRY D. LIU,                                    3:14-CV-00908-BR

       Plaintiff,                            OPINION AND ORDER

v.

PORTLAND STATE UNIVERSITY, et
al.,

       Defendants.


**MICAH D. FARGEY**
Fargey Law PC
5 Centerpointe Drive, 4th Floor
Lake Oswego, OR 97035
(503) 946-9426

      Attorneys for Plaintiff

**P.K. RUNKLES-PEARSON**
**SHARAE M. WHEELER**
Miller Nash LLP
111 S.W. Fifth Avenue
Suite 3400
Portland, OR 97204
(503) 205-2314

      Attorneys for Defendants Portland State University,
      Jacqueline Balzer, Domanic Thomas, and Joseph Schilling


1 - OPINION AND ORDER

**TRACY REEVE**
Portland City Attorney
**J. SCOTT MOEDE**
**WADE H. TUCKER**
Deputy City Attorneys
1221 S.W. Fourth Avenue, Suite 430
Portland, OR 97204
(503) 823-4047

        Attorneys for Defendants City of Portland and James
        Crooker

**KAREN O'KASEY**
**JASON R. POSS**
Hart Wagner LLP
1000 S.W. Broadway, Twentieth Floor
Portland, Oregon 97205
(503) 222-4499

        Attorneys for Defendant Oregon Health & Sciences
        University

**DUNCAN K. FOBES**
Patterson Buchanan Fobes & Leitch
2112 Third Avenue, Suite 500
Seattle, WA 98121
(206) 462-6700

        Attorneys for Defendant Cascadia Behavioral Healthcare


**BROWN, Judge.**

    This matter comes before the Court on the Renewed Motion (#165) for Summary Judgment of Defendants City of Portland and Portland Police Sergeant James Crooker (City Defendants).  For the reasons that follow, the Court **GRANTS** City Defendants' Motion and **DISMISSES with prejudice** Plaintiff's claims against City Defendants.

2 - OPINION AND ORDER

**BACKGROUND**

The following facts are taken from the Agreed Facts in the parties' Pretrial Order and the parties' materials related to City Defendants' Motion for Summary Judgment and are undisputed unless otherwise noted.

Plaintiff Henry D. Liu was enrolled as a graduate student in the Conflict Resolution Program at Portland State University (PSU) from the beginning of the fall term in 2011 through June 21, 2012.

On April 20, 2012, another graduate student in the Conflict Resolution Program told PSU Professor Rachel Cunliffe that Plaintiff had made statements about the faculty that the student found threatening.  At some point the student also reported her conversation with Plaintiff to PSU Campus Public Safety (CPS) Officer Sergeant Joseph Schilling.  The student specifically advised Sergeant Schilling that she was a classmate of Plaintiff and that Plaintiff told the student during a break from class on April 12, 2012, that (1) Plaintiff "had issues" with the Conflict Resolution Program and its Director, Professor Robert Gould, because of an unsatisfactory grade that he had received after he caused another student to cry in class; (2) he "had issues" because a fellow student had allegedly used the word "chink" while speaking with him; and (3) he made statements that made the student believe he was angry because he felt faculty members were

treating him differently due to his ethnicity.  The student also
advised Sergeant Schilling that Plaintiff told her after class on
April 12, 2012, that he had a back or spinal injury and was
taking a large amount of pain medication that often interfered
with his thinking and daily activity.  The student suggested
alternatives such as yoga and meditation to relieve stress, but
Plaintiff stated:  "[T]his situation is really pushing me over
the edge and we know what happens when students are pushed over
the edge."  The student emailed Plaintiff shortly after April 12,
2012, and Plaintiff responded he was very stressed, upset, and
unable to sleep and was "becoming aware of repressed emotions of
anger."  The student told Sergeant Schilling that the student
talked to Plaintiff after class on April 19, 2012, about
Professor Gould, and Plaintiff became agitated, raised his voice,
used profanity, and stated:  "I'm about ready to stick a .45 in
his ass."  Plaintiff then lowered his voice and apologized, but
he continued to express frustration and stated he was unable to
sleep.  He also repeated he was taking a lot of pain medication,
but it was not helping his pain level.  Plaintiff added:
"Professor Stan Sitnick giving him a [bad] grade did not help
. . ., 'he could get shot.'"  Plaintiff told the student that he
was noticing he had "a lot of hatred."  The student became
alarmed, changed the subject, and asked Plaintiff if he had
weekend plans.  Plaintiff responded he planned to go to "target

4 - OPINION AND ORDER

practice on Sunday." Sergeant Schilling believed the student's statements were credible and felt concerned.

Sergeant Schilling ascertained Plaintiff was living off of the PSU campus. Accordingly, Sergeant Schilling contacted the Portland Police Bureau and shared with Defendant Portland Police Officer James Crooker the student's statements about Plaintiff.

Officer Crooker contacted the Project Respond team from Defendant Cascadia Behavorial Health Care and asked them to assist in a visit to Plaintiff's residence for a mental-health evaluation and possible Director's Hold pursuant to former Oregon Revised Statute § 426.233.

On April 20, 2012, Officer Crooker, Portland Police Officer Jason Walters, Sergeant Schilling, CPS Officer David Baker, and Cascadia Project Respond personnel Rachel Phariss and Sarah Schellhorn went to Plaintiff's residence to address what they considered to be Plaintiff's possible threat to the community. Phariss and Schellhorn waited around the corner from Plaintiff's apartment while Officers knocked on Plaintiff's door.

Officer Crooker testifies in his Declaration that Plaintiff "appeared dazed and confused and was unable to communicate clearly" when he answered the door. Decl. of James Crooker at ¶ 8. Plaintiff permitted the officers to enter his apartment. Officer Crooker asked Plaintiff if there were any firearms in his apartment, and Plaintiff stated he did not have any firearms.

5 - OPINION AND ORDER

When the officers entered Plaintiff's apartment, however, they observed pamphlets for firearms on a table as well as an empty rifle box.  At that point Officer Crooker asked Plaintiff again if there were any firearms in his apartment.  Officer Crooker testifies in his Declaration that Plaintiff "began to back away from [Officer Crooker] and the other officers.  In response [Officer Crooker] took [Plaintiff's] wrist and handcuffed Plaintiff 'for his own safety' and read Plaintiff his *Miranda* rights.  Crooker Decl. at ¶ 9.  After some discussion Plaintiff told the officers that he had firearms and agreed to tell the officers where to find them in Plaintiff's apartment.  Officers eventually found unloaded .22 and .45 caliber handguns, an unloaded M4 carbine assault rifle, an unloaded 9mm handgun, and 'thousands of rounds of ammunition.'"  Crooker Decl. at ¶ 10. Officers also found "various knifes, survival tools (including an axe), a canteen, water bottles, dressings for wounds, rope, extra magazine clips, and flashlights."  *Id*.  Officer Crooker testified in his Declaration that in his experience "[t]he manner in which all these items were laid out was consistent with that of a moment's-notice preparedness for immediate accessibility to grab pre-packed grab bags in the event that combat were to occur suddenly."  *Id*.  Officers also found prescriptions for Percocet and Tramadol in Plaintiff's name, two bottles of Oxycodone prescribed to Plaintiff's father, and several empty bottles of

alcohol.  Officer Crooker spoke with Plaintiff, and, "after a
lengthy conversation," Plaintiff admitted he had made "bone-
headed" comments "including something about using a .45 caliber
handgun to kill a professor."  Crooker Decl. at ¶ 11.  During his
conversation with Plaintiff, Officer Crooker

> began to piece together information such as the
> time frame when the dispute over [Plaintiff's]
> grades began and the time frame when the . . .
> assault rifle was purchased and shipped to his
> home.  Sergeant Schilling confirmed that the time
> frame was consistent with one another, indicating
> that [Plaintiff] did purchase the assault rifle
> shortly after the dispute over his grades started.

Aff. of Scott Moede, Ex. 12 at 29.  Officer Crooker decided to
have Phariss and Schellhorn come in and speak to Plaintiff
directly when Officer Crooker

> started to put that together with the fact that
> [Plaintiff] had specifically purchased weapons,
> specifically made and communicated a plan to kill
> a professor, his proximity to the school, the --
> the fact that he wasn't answering questions, the
> fact that he had alcohol around the apartment,
> along with medications, the fact that he was able
> to recall some events, but when I asked him
> specifically to recall the events that occurred
> with the professor, that he wasn't recalling those
> events.  These are all -- these are all items of
> concern that point to our need as law enforcement
> officers to do something to safeguard the
> community from this person.

Moede Aff., Ex. 12 at 29-30.

    Phariss and Schellhorn entered Plaintiff's apartment after
Officer Crooker handcuffed Plaintiff.  Phariss and Schellhorn
interviewed Plaintiff for 30 or 40 minutes.  Phariss testifies in

her Declaration that Plaintiff agreed the police could remove the
firearms from his apartment.  Plaintiff, however, "appeared to be
confused and . . . kept sending the police to the wrong places to
locate the weapons he had throughout his apartment."  Decl. of
Rachel Phariss at ¶ 6.  Phariss states

> [Plaintiff] said he could not remember making the
> threatening comments he made to [the student], but
> he admitted that he may have made such comments.
> [Plaintiff's] conversation was vague and he kept
> going off on tangents.  His thought process was
> circular.  He denied hearing voices or having
> hallucinations.  I could not tell if he was
> disoriented, but he did appear to be confused.  He
> denied any mental health history, and he denied
> having any intent to harm himself.  He seemed to
> marginalize the allegation that he had made
> threats about shooting one of his professors.  He
> also denied having any intention to shoot anyone
> at PSU.
>
> I observed the following things while I was in
> [Plaintiff's] apartment:  (1) the receipt from his
> recently purchased AR 15 indicated that he had
> bought it after his problems with PSU began;
> (2) [Plaintiff] had ammunition and tactical gear,
> including duffle bags with dehydrated food,
> knives, and "quick stop", which will stop bleeding
> if a person is shot by a bullet; (3) there were
> empty beer, liquor, and wine bottles strewn about
> the apartment; and (4) there were Percocet and
> Tramadol pills on his coffee table as well as two
> bottles of Oxycodone with [Plaintiff's] father's
> name on them.

Phariss Decl. at ¶¶ 7-8.  Phariss testifies "[d]iagnosing
[Plaintiff] was difficult because it was unclear whether his
behavior was due to alcohol, drugs, or mental illness."  Phariss
Decl. at ¶ 9.  Phariss, therefore, deferred diagnosis, but she
decided Plaintiff "would benefit from a full psychological

evaluation." Phariss and Schellhorn consulted with Meg Kaveny, Cascadia Project Respond Supervisor, and Kaveny consulted with Jay Auslander, Cascadia's Director of Emergency Services. Ultimately Phariss, Kaveny, and Auslander concluded a Director's Hold on Plaintiff was justified because there was probable cause to believe Plaintiff was

> dangerous to others and [in] need of immediate psychological evaluation based on (1) [Plaintiff's] speech latency, which did not appear to be a language issue; (2) [Plaintiff's] apparent confusion; (3) [Plaintiff's] vague explanations of his behavior; (4) [Plaintiff] minimizing the allegations against him and not appreciating the seriousness of making threats; (5) the information regarding his statements threatening to shoot one of his professors; and (6) the large amount of weapons, ammunition, and tactical gear found in his apartment.

Phariss Decl. at ¶ 9. Phariss completed a Report of Peace Officer Custody of an Allegedly Mentally Ill Person as Directed by a Community Mental Health Director and issued a Director's Hold on Plaintiff for the following reasons:

> Concerns about targeted specific threats, large number of firearms, ammo & tactical gear, speech latencies, confusion & vague explanation of behavior & previous statements that minimize concerns. Extreme risk of potential harm to others as evidenced by the above risk factors.

Phariss Decl., Ex. 1 at 1. The Report directed Officer Crooker to take Plaintiff into custody pursuant to Oregon Revised Statute § 426.228(2) and to transport Plaintiff to Oregon Health and Science University (OHSU) for evaluation. Officer Crooker

transported Plaintiff to OHSU in his patrol car.

Plaintiff remained at OHSU from April 20, 2012, through April 25, 2012, during which time he was evaluated by numerous medical professionals including Drs. Anne Gross, Bridgid Crowley, Joshua Russell, and Robert Henrickson.

In June 2012 Plaintiff was expelled from PSU.

On May 2, 2014, Plaintiff filed *pro se* a first amended complaint in Clatsop County Circuit Court against 40 Defendants alleging seventeen claims for relief related to Plaintiff's interactions with Portland police officers, the seizure of Plaintiff's guns, Plaintiff's commitment to the OHSU psychiatric ward, Plaintiff's expulsion from PSU, and articles about Plaintiff's expulsion published by the PSU newspaper, *The Vanguard*, all occurring between April 2012 and June 2012.

On June 5, 2014, Defendants removed the matter to this Court on the basis of federal-question jurisdiction.

At some point before June 30, 2014, Plaintiff obtained counsel.

On August 15, 2014, Plaintiff filed a Second Amended Complaint against 29 Defendants alleging nine claims for relief related to Plaintiff's interaction with various Portland police officers, the seizure of Plaintiff's guns, Plaintiff's commitment to the OHSU psychiatric ward, and Plaintiff's expulsion from PSU, all occurring between April 2012 and June 2012.

10 - OPINION AND ORDER

On August 28, 2015, PSU Defendants filed a Motion for Summary Judgment as to all of Plaintiff's claims against them.

On November 23, 2015, Plaintiff filed a Motion for Extension of Summary Judgment-Related Court-Imposed Deadlines, which PSU Defendants opposed.

On December 4, 2015, the Court held a status conference. Based on the parties' representations at that conference, the Court ordered the parties to meet in person and to confer regarding the dismissal of certain parties and claims from this proceeding. The Court struck all pending Motions and directed the parties to file a preliminary Pretrial Order setting out the parties, claims, and defenses that remained in this matter after the parties' conferral.

On December 18, 2015, the parties filed a Joint Proposed Pretrial Order in which they dismissed numerous claims and parties and advised the Court that this matter would proceed only as to Plaintiff's claims (1) against the City of Portland and Officer Crooker pursuant to 42 U.S.C. § 1983 for unlawful seizure in violation of Plaintiff's rights under the Fourth Amendment to the United States Constitution; (2) against OHSU pursuant to 42 U.S.C. § 1983 for unlawful confinement in violation of the Fourth Amendment to the United States Constitution; (3) against PSU, Defendant Jacqueline Balzer, and Defendant Domanic Thomas pursuant to 42 U.S.C. § 1983 for violation of Plaintiff's right

11 - OPINION AND ORDER

to due process under the Fourteenth Amendment to the United States Constitution; (4) against the City of Portland and Officer Crooker for false arrest and/or confinement in violation of state law; (5) against Cascadia Behavioral Healthcare for unlawful confinement in violation of state law; (6) against PSU, Schilling, and Cascadia for negligence "based on their respective roles in the arrest of Plaintiff"; and (7) against PSU, Balzer, and Thomas for negligence in "failing to exercise due care in connection with the process and proceedings that led to Plaintiff's expulsion from PSU."

On December 23, 2015, PSU Defendants filed a Renewed Motion for Summary Judgment.

On January 15, 2016, Cascadia filed a Renewed Motion for Summary Judgment.

On January 15, 2016, OHSU filed a Renewed Motion for Summary Judgment.

On March 28, 2016, the Court issued an Opinion and Order in which it granted PSU Defendants' Renewed Motion for Summary Judgment and dismissed with prejudice Plaintiff's claims against PSU Defendants.

On May 12, 2016, the Court granted Cascadia's Renewed Motion for Summary Judgment and dismissed with prejudice Plaintiff's claims against Cascadia.

On May 16, 2016, the Court granted OHSU's Motion for Summary

Judgment and dismissed with prejudice Plaintiff's claims against OHSU.

## STANDARDS

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Washington Mut. Ins. v. United States*, 636 F.3d 1207, 1216 (9th Cir. 2011). *See also* Fed. R. Civ. P. 56(a). The moving party must show the absence of a dispute as to a material fact. *Rivera v. Philip Morris, Inc.*, 395 F.3d 1142, 1146 (9th Cir. 2005). In response to a properly supported motion for summary judgment, the nonmoving party must go beyond the pleadings and show there is a genuine dispute as to a material fact for trial. *Id.* "This burden is not a light one . . . . The non-moving party must do more than show there is some 'metaphysical doubt' as to the material facts at issue." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citation omitted).

A dispute as to a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002)(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The court must draw all reasonable inferences in favor of the nonmoving party. *Sluimer*

13 - OPINION AND ORDER

*v. Verity, Inc.*, 606 F.3d 584, 587 (9th Cir. 2010).  "Summary judgment cannot be granted where contrary inferences may be drawn from the evidence as to material issues." *Easter v. Am. W. Fin.*, 381 F.3d 948, 957 (9th Cir. 2004)(citation omitted).  A "mere disagreement or bald assertion" that a genuine dispute as to a material fact exists "will not preclude the grant of summary judgment." *Deering v. Lassen Cmty. Coll. Dist.*, No. 2:07-CV-1521-JAM-DAD, 2011 WL 202797, at *2 (E.D. Cal., Jan. 20, 2011) (citing *Harper v. Wallingford*, 877 F.2d 728, 731 (9th Cir. 1989)).  When the nonmoving party's claims are factually implausible, that party must "come forward with more persuasive evidence than otherwise would be necessary." *LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1137 (9th Cir. 2009)(citation omitted).

The substantive law governing a claim or a defense determines whether a fact is material.  *Miller v. Glenn Miller Prod., Inc.*, 454 F.3d 975, 987 (9th Cir. 2006).  If the resolution of a factual dispute would not affect the outcome of the claim, the court may grant summary judgment.  *Id*.

## DISCUSSION

As noted, Plaintiff's remaining claims against City Defendants are for unlawful seizure in violation of the Fourth Amendment to the United States Constitution brought pursuant to § 1983 and for false arrest and/or confinement in violation of

14 - OPINION AND ORDER

state law.  City Defendants move for summary judgment on

Plaintiff's claims against them on the grounds that Officer

Crooker is immune from Plaintiff's claims pursuant to Oregon

Revised Statutes §§ 426.233, 426.228, and 426.355(6); Plaintiff

fails to allege a claim under *Monell v. Department of Social*

*Services of City of New York*, 436 U.S. 658, 691 (1978); and/or to

the extent that Plaintiff has alleged a claim under *Monell*,

Plaintiff's claim is without merit.

## I.    **Officer Crooker is immune from Plaintiff's claims against him.**

Oregon Revised Statute § 426.233 provides in pertinent part:

> (1)(a) A community mental health program director
> . . . or a designee of the director may take one
> of the actions listed in paragraph (b) of this
> subsection when the community mental health
> program director or designee has probable cause to
> believe a person:
>
>> (A) Is dangerous to self or to any other
>> person and is in need of immediate care,
>> custody or treatment for mental illness.
>
>> * * *
>
> (b) The community mental health program director
> or designee under the circumstances set out in
> paragraph (a) of this subsection may:
>
>> (A) Notify a peace officer to take the person
>> into custody and direct the officer to remove
>> the person to a hospital or nonhospital
>> facility approved by the Oregon Health
>> Authority.

It is undisputed that on April 20, 2012, Phariss was a designee

of a community mental-health program director and authorized to

15 - OPINION AND ORDER

notify a peace officer to take a person into custody and to
remove the person to a facility approved by the Oregon Health
Authority.  It is also undisputed that Phariss issued a
Director's Hold pursuant to § 426.233(1)(b)(A).

Oregon Revised Statute § 426.228(2) provides in pertinent
part:

> A peace officer *shall* take a person into custody
> when the community mental health program director,
> pursuant to ORS 426.233, notifies the peace
> officer that the director has probable cause to
> believe that the person is imminently dangerous to
> self or to any other person.  As directed by the
> community mental health program director, the
> peace officer *shall* remove the person to a
> hospital or nonhospital facility approved by the
> authority.

Emphasis added.  Phariss notified Officer Crooker that she had
probable cause to believe Plaintiff was dangerous to himself or
to others and issued a Director's Hold on Plaintiff pursuant to
Oregon Revised Statute § 426.233 on April 20, 2012.  In addition,
this Court concluded in its May 12, 2016, Opinion and Order that
Phariss had probable cause to issue the Director's Hold on
Plaintiff.  Thus, Officer Crooker was required by § 426.228(2) to
take Plaintiff into custody and to remove Plaintiff to OHSU.

Oregon Revised Statute § 426.335(6) provides:

> A peace officer. . . may not in any way be held
> criminally or civilly liable for actions pursuant
> to ORS 426.228 to 426.235 if the individual or
> facility acts in good faith, on probable cause and
> without malice.

City Defendants assert § 426.335(6) provides Officer Crooker with

16 - OPINION AND ORDER

immunity as to Plaintiff's claims because Officer Crooker acted in good faith, without malice, and with probable cause when he took Plaintiff into custody and transported him to OHSU pursuant to the Director's Hold.

Plaintiff, however, asserts Officer Crooker did not have probable cause[1] to involuntarily commit Plaintiff because the threats that Plaintiff made were "merely hyperbolic," Plaintiff did not do anything illegal, Plaintiff lawfully owned the firearms found at his apartment, Plaintiff was legally prescribed Percocet and Tramadol, Plaintiff's father left the Oxycodone when he visited Plaintiff's apartment, and Plaintiff advised the officers that he did not intend to commit any act of violence.

City Defendants point out that § 426.228(2) makes it mandatory for a peace officer to take a person into custody and to remove the person to a facility approved by the Oregon Health Authority.  According to City Defendants, therefore, § 426.228(2) required Officer Crooker to take Plaintiff into custody and to remove him to OHSU even if Officer Crooker himself did not have probable cause.  The Court agrees.

City Defendants also assert even if Officer Crooker was required to have independent probable cause to enforce the Director's Hold issued by Phariss, Officer Crooker, in fact,

---

[1] Plaintiff appears to concede Officer Crooker acted in good faith and without malice, and Plaintiff does not offer any evidence to the contrary.

independently had probable cause to take Plaintiff into custody
and to remove him to OHSU.

Probable cause is not defined in Chapter 426.  Oregon
courts, however, have analogized probable cause in Chapter 426 to
the definition set out in Oregon Revised Statute § 131.005[2] and
held it is defined as "a substantial objective basis for
believing that more likely than not a person is mentally ill."
*Pyles v. Winters*, No. 1:12-cv-00346-CL, 2013 WL 3475331, at *4
(D. Or. July 9, 2013)(citing *State v. Smith*, 71 Or. App. 205, 211
(1984)).  When "determining whether objective probable cause
exists, [the court must] consider the totality of the
circumstances presented to the officer and reasonable inferences
that may be drawn from those circumstances; no single factor is
dispositive."  *State v. Kelly*, 274 Or. App. 363, 372 (2015)
(quotation omitted).

"'The determination of probable cause is a legal, not a
factual, conclusion.  Probable cause does not require
certainty.'"  *Pyles*, 2013 WL 3475331, at *4 (quoting *State v.
Herbert*, 302 Or. 237, 241 (1986)).  "[I]f there is probable
cause, it is irrelevant if the person turns out to be
noncommittable."  *Id.* (citing *Chathas v. Smith*, 884 F.2d 980, 987

---

[2] Oregon Revised Statute § 131.005(11) defines probable
cause as "a substantial objective basis for believing that more
likely than not an offense has been committed and a person to be
arrested has committed it."

(7th Cir. 1989)).  The issue, therefore, is not whether Plaintiff

is mentally ill, but whether under the totality of the

circumstances Officer Crooker had information sufficient to form

a substantial objective belief that it was more likely than not

that Plaintiff was a danger to himself or to others.

As noted, when Plaintiff opened the door to his apartment,

Officer Crooker observed Plaintiff "appeared dazed and confused

and was unable to communicate clearly" with officers.  Crooker

Decl. at ¶ 10.  When officers entered Plaintiff's apartment, they

observed pamphlets for firearms on a table as well as an empty

rifle box.  The officers eventually found unloaded .22 and .45

caliber handguns, an unloaded M4 carbine assault rifle, an

unloaded 9mm handgun, and "thousands of rounds of ammunition" in

Plaintiff's apartment.  Crooker Decl. at ¶ 10.  Officers also

found "various knifes, survival tools (including an axe), a

canteen, water bottles, dressings for wounds, rope, extra

magazine clips, and flashlights."  *Id*.  Officer Crooker believed,

based on his experience, that "[t]he manner in which all these

items were laid out was consistent with that of a moment's-notice

preparedness for immediate accessibility to grab pre-packed grab

bags in the event that combat were to occur suddenly."  *Id*.

Officers also found prescriptions for Percocet and Tramadol in

Plaintiff's name, two bottles of Oxycodone prescribed to

Plaintiff's father, and several empty bottles of alcohol.  In

19 - OPINION AND ORDER

addition, Officer Crooker "pieced together" that Plaintiff purchased the assault rifle found in his apartment shortly after the dispute over his grades began.   In summary, Officer Crooker noted the following totality of the circumstances:

> [Plaintiff] had specifically purchased weapons, specifically made and communicated a plan to kill a professor, his proximity to the school, the -- the fact that he wasn't answering questions, the fact that he had alcohol around the apartment, along with medications, the fact that he was able to recall some events, but when I asked him specifically to recall the events that occurred with the professor, that he wasn't recalling those events.   These are all -- these are all items of concern that point to our need as law enforcement officers to do something to safeguard the community from this person.

Moede Aff., Ex. 12 at 29-30.   Similarly, Phariss testifies in her Declaration that Plaintiff admitted to Officer Crooker and Phariss that he made threatening comments about PSU professors and staff to another student.   Officer Crooker was in the room while Phariss spoke with Plaintiff.   Phariss described Plaintiff's "conversation [as] vague and he kept going off on tangents.   His thought process was circular."

Plaintiff testifies in his Declaration that he had "camping equipment, like backpacks, food, water, a first-aid kit, including QuikClot and emergency supplies, rope, and an ax" in his apartment on April 20, 2012, because his "fiancée was [going to] visit[] from Shanghai, and [he] planned to take her camping." Decl. of Henry Liu at ¶ 15.   Plaintiff also testifies he

20 - OPINION AND ORDER

attempted to explain the presence of these items to officers, but "no one seemed to care." *Id.* Phariss, however, states in her contemporaneous Report that Plaintiff "never explained his large amount of ammo or tactical gear to [her] or the police." In addition, the initial assessment notes about Plaintiff when he arrived at OHSU on April 20, 2012, reflect Plaintiff stated he "lives alone [and] does not have a girlfriend/partner." Declaration of Micah D. Fargey, Ex. 2 at 9. Similarly, during Plaintiff's initial psychiatric evaluation by Paul Leung, M.D., on April 21, 2012, Plaintiff noted his current relationships were "family." Fargey Decl., Ex. 3 at 3. Plaintiff did not mention a girlfriend or partner. In Plaintiff's Discharge Summary completed by Bridgid Crowley, M.D., on April 25, 2012, however, Plaintiff reportedly stated the "packs found in his apartment were to be used for camping and spending time outdoors with his fiance." Fargey Decl., Ex. 2 at 19.

Similarly, Plaintiff testifies in his Declaration that he was not dazed or confused when officers arrived at his apartment and that he was polite, kind, respectful, patient, honest, and transparent. Liu Decl. at ¶ 12. The Declarations of Officer Crooker and Phariss, however, indicate Plaintiff was confused. Phariss's contemporaneous Report also indicated Plaintiff was confused and disoriented. In addition, the OHSU intake notes from April 20, 2012, reflect Plaintiff's thought processes were

21 - OPINION AND ORDER

"disorganized, pt had trouble remembering questions, answering questions sequentially, etc."  Fargey Decl., Ex. 2 at 9. Plaintiff's memory was described as "unreliable, pt was not forthcoming with either officers of SW, reports gaps in his memory."  *Id*.

On this record the Court concludes Plaintiff has not established there is any genuine dispute of material fact as to whether Officer Crooker had information sufficient to form a substantial objective belief based on the totality of the circumstances that it was more likely than not that Plaintiff was a danger to himself or to others.  Thus, to the extent that it was required, Officer Crooker also had independent probable cause to take Plaintiff into custody and to remove him to OHSU.

As noted, § 426.335(6) provides:

> A peace officer. . . may not in any way be held criminally or civilly liable for actions pursuant to ORS 426.228 to 426.235 if the individual or facility acts in good faith, on probable cause and without malice.

Officer Crooker, therefore, cannot be held liable for Plaintiff's claims against him.

Accordingly, the Court grants City Defendant's Motion for Summary Judgment as to Plaintiff's claims against Officer Crooker.

**II. Plaintiff has not established a state-law claim for false arrest as to the City of Portland.**

As noted, Plaintiff also brings a state-law claim for false

22 - OPINION AND ORDER

arrest and/or confinement against the City of Portland.  To the extent that the City does not have immunity from such a claim pursuant to § 426.336, the City asserts Plaintiff has not established a claim for false arrest or confinement because Officer Crooker had probable cause to detain Plaintiff and to remove him to OHSU.

Under Oregon law "the tort [of false arrest] has four elements:  (1) defendant must confine plaintiff; (2) defendant must intend the act that causes the confinement; (3) plaintiff must be aware of the confinement; and (4) the confinement must be unlawful."  *Hiber Creditors Collection Serv., Inc.*, 154 Or. App. 408, 413 (1998)(citing *Lukas v. J.C. Penney Co.*, 233 Or. 345, 353 (1963), and *Walker v. City of Portland*, 71 Or. App. 693, 697 (1985)).

Probable cause is a complete defense to a state-law claim for false arrest.  *See, e.g., Smith v. Almada*, 640 F.3d 931, 944 (9th Cir. 2011)("like false arrest claims, probable cause is an absolute defense to malicious prosecution.").

Under Oregon law an officer has probable cause if "there is a substantial objective basis for believing that more likely than not an offense has been committed and a person to be arrested has committed it."  *State v. Makuch*, 340 Or. 658 (2006)(citing Or. Rev. Stat. § 131.005(11)).

The Court already has concluded Officer Crooker had probable

cause to detain and to remove Plaintiff because of the mandatory language of § 426.228(2), and, in addition, he had an independent basis for finding probable cause.  The City, therefore, cannot be held liable for Plaintiff's state-law claim for false arrest/confinement.

Accordingly, the Court grants City Defendant's Motion for Summary Judgment as to Plaintiff's state-law claim against the City for false arrest.

### III. Plaintiff has not established a *Monell* claim against the City of Portland.

City Defendants assert they are entitled to summary judgment as to Plaintiff's § 1983 claim for unlawful seizure in violation of the Fourth Amendment because Plaintiff has not established there is any policy, practice, or custom of the City that caused a violation of Plaintiff's constitutional rights.

The Supreme Court has held liability of a government body will lie only when "action pursuant to official municipal policy of some nature caused a constitutional" violation and not on the basis of *respondeat superior*.  *Monell*, 436 U.S. at 691.  Such liability may attach only when an employee acted pursuant to an expressly adopted official policy or pursuant to a longstanding practice or custom.  *See, e.g., Lytle v. Carl*, 382 F.3d 978, 981 (9th Cir. 2004); *Webb v. Sloan*, 330 F.3d 1158, 1164 (9th Cir. 2003).  "The 'official policy' requirement was intended to distinguish acts of the *municipality* from acts of *employees* of

24 - OPINION AND ORDER

the municipality, and thereby make clear that municipal liability
is limited to action for which the municipality is actually
responsible." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479
(1986)(emphasis in original).  Municipal "[l]iability may attach
. . . only where the municipality itself causes the
constitutional violation through 'execution of a government's
policy or custom, whether made by its lawmakers or by those whose
edicts or acts may fairly be said to represent official policy.'"
*Ulrich v. City and Cnty. of San Francisco*, 308 F.3d 968, 984 (9th
Cir. 2002)(quoting *Monell*, 436 U.S. at 694).

        The Supreme Court and Ninth Circuit have made clear that
municipalities cannot be held liable when the individual officer
has not inflicted any constitutional injury under *Monell*.  *See,
e.g., City of Los Angeles v. Heller*, 475 U.S. 796, 799
(1986)("neither *Monell* . . . nor any other of our cases
authorizes the award of damages against a municipal corporation
based on the actions of one of its officers when in fact the jury
has concluded that the officer inflicted no constitutional
harm."); *Yousefian v. City of Glendale*, 779 F.3d 1010, 1016 (9th
Cir. 2015)("[M]unicipalities cannot be held liable when the
individual police officer has inflicted no constitutional injury.
Because Yousefian's § 1983 claims against [Officer] Lizarraga and
[Detective] Kmbikyan fail, his municipal liability claim also
necessarily fails.").

The Court already has concluded Officer Crooker had both independent probable cause to detain Plaintiff and to remove him to OHSU as well as a duty to do so pursuant to § 426.228(2).  The Court also has concluded Officer Crooker did not violate Plaintiff's rights under the Fourth Amendment.  The Court, therefore, also concludes the City cannot be held liable because Plaintiff has not established his constitutional rights were violated.

Accordingly, the Court grants City Defendants' Motion for Summary Judgment as to Plaintiff's *Monell* claim against the City.


### CONCLUSION

For these reasons, the Court **GRANTS** City Defendants' Motion (#165) for Summary Judgment and **DISMISSES with prejudice** Plaintiff's claims against City Defendants.

IT IS SO ORDERED.

DATED this 17th day of May, 2016.


/s/ Anna J. Brown

_____
ANNA J. BROWN
United States District Judge


26 - OPINION AND ORDER